## Case No. 11,045.

### PETTINGILL v. DINSMORE.

[2 Ware (Dav. 208) 212:[1] 2 N. Y. Leg. Obs. 119; 6 Law Rep. 255.]

District Court, D. Maine. May 22, 1843.

PLEADING IN ADMIRALTY—DISTINCT ALLEGATIONS FOR EACH WRONG—PROOFS—SEAMEN—PUNISHMENT—JUSTIFICATION—HABITUAL MISCONDUCT.

1. In a libel for a marine tort, the libellant must set forth, in a distinct allegation, each separate and distinct wrong on which he intends to rely, and for which he claims damages.

2. If he intends to rely on general ill treatment and oppression on the part of the master, in aggravation of damages, it must be propounded in a distinct allegation, to enable the master to take issue upon it in his answer.

3. The proofs in the case must be confined to the matters that are put in issue by the libel and answer.

4. When a master is prosecuted in the admiralty for punishing a seaman, he may be permitted, in justification or in mitigation of damages, to show that the seaman was habitually careless, disobedient, or negligent in his conduct. The Lowther Castle, 1 Hagg. 385.

5. But in order to be admitted to this defense, he must set forth such habitual misconduct in a defensive allegation in his answer, in order that the libellant may be enabled to meet the charge by counter evidence.

This was a libel in personam for an assault and battery on the high seas. The libellant shipped as steward, in October, 1841, on board the barque Massasoit, of Bath, for a whaling voyage. He was, in the language of seamen, a green hand; that is, it was his first voyage as a seaman. For the first two weeks he was so much affected by sea-sickness as to be unable to perform his duty. After that time he entered on his duties, and no difficulty, or at least none of a serious nature, occurred until the 28th of November. On that day the cabin boy, in shaking the cabin table cloth over the side of the vessel accidentally dropped it into the sea, and it was lost. He mentioned the fact to the steward, who told him to inform the master. The boy replied that he was afraid, and requested the steward to do it for him, who accordingly did, and the first assault complained of was then made. The next morning the libellant was called on deck and seized up to the rigging and kept so for from half an hour to an hour which is the other wrong complained of.

Mr. Sewall, for libelant.
Mr. Tolman, for respondent.

WARE, District Judge. This is what in the language of the admiralty is technically termed a cause of damage. It appears from the testimony of the libellant's witnesses that, when the table cloth was lost by the boy, he mentioned the fact to Maxwell, the cooper, who advised him to mention it to the master. He replied that he was afraid the

[1] [Reported by Edward Daveis, Esq.]

master would flog him. He then advised him to inform the steward and ask him to communicate the facts to the master. This being done, the steward came on deck and informed the master. He was irritated and answered very roughly. The steward replied that he would pay for the cloth. The master answered that he wanted no other pay than what he could get from his hide; that he had promised him a flogging, and that he would keep his promise. Pettingill replied that if he flogged him he would have satisfaction if he lived to get home; upon which the master struck him and brought him to the deck, either by the violence of the blow or by throwing him down. While down he shook him violently, brought his knees or feet upon his breast, seized him by the hair with such violence as to pull or tear a considerable quantity from his head, so as to leave a spot bare, and after holding him in this manner for some time, allowed him to get up and ordered him into the cabin. The next morning all hands were called aft and the steward was called from the cabin on the quarter deck. The mate was then directed to seize him up by both hands to the rigging, with his arms spread and extended upwards to their full length, and as high as they could be to leave him standing on the deck. In this position he was kept for from half an hour to an hour. Two of the witnesses state that his shirt was stripped up, so that his body was left bare. The other witnesses do not mention this fact, and the witnesses for the master deny it. While the libellant was in this position the master called the attention of the crew to him, and walked the deck forward and back, apparently in great passion, applying to the steward various insulting and degrading epithets, and observed that this was what he called a spread eagle, and that he would make an example of Pettingill. Except where the hair was torn from his head there were no marks of violence apparent on the person of the steward. For two or three days afterwards he complained of a severe pain in his head, though he was not so injured but that he immediately returned to the performance of his duty. The witnesses for the master give a more subdued and mitigated account of the assault on the 28th, and of the seizing up to the rigging on the morning of the 29th. They saw no blows inflicted, no stamping, or jamming, with the knees or feet, on the breast of the libellant, and no pulling of hair, nor did they hear any complaint of the steward: but they say he acknowledged his fault and asked the master's pardon. But with respect to the cause or the occasion of the punishment there is no discrepancy between the witnesses. This is the substance of the testimony so far as it applies to the allegations of the libel in the form in which it was originally drawn. But after the evidence was taken and the cause ready for a hearing, the counsel for the libellant moved for liberty to file an amend-

ment to the libel. The amendment offered sets forth more particularly the assaults on the 28th and 29th, and also contains two new substantive allegations, one of another distinct assault in the cabin in the evening of the 28th, and another of general ill usage and oppressive cruelty on the part of the master. The amendment is objected to on the part of the respondent.

The court without doubt has the power to allow an amendment in any stage of the proceedings before a final decree, when the purposes of justice require it. But a motion to amend is addressed to the discretion of the court, and, when it will necessarily lead to delay and an increase of expense, it will not be allowed unless the court sees that substantial justice cannot be attained without an amendment. The practice of the admiralty does not insist on all that technical exactness in pleading, which is required by courts proceeding according to the course of the common law. But the libellant is required to state in clear, distinct and intelligible allegations, the whole gravamen of his complaint. He must set forth every material and substantive wrong, upon which he intends to rely and for which he claims damage, in a distinct allegation. If he intends to claim damages for separate and independent assaults, they should be separately set forth; otherwise the respondent will not know what he has to answer. And the proofs in the case must follow the allegations. It is not intended to be said that every circumstance of aggravation attending an assault and battery must be minutely described, but when the libellant proposes to offer proof and claim damages for separate assaults at different times, he is bound to set them out in separate allegations. And so if he means to rely on general harsh treatment and continued and systematic oppression and cruelty, either in aggravation or as an independent and substantive wrong, the libel should contain, in a separate article, an allegation to that effect, in order that the respondent may take issue on the matter and prepare his defense accordingly. Orne v. Townsend [Case No. 10,583]; Treadwell v. Joseph [Id. 14,157].

Now, in the libel as originally framed, there is no mention of an assault in the cabin, and yet, as it is alleged in the amendment, it can in no sense be considered as a continuation of that which took place on deck, nor is there any distinct charge of habitual ill-treatment and oppression so formally set out as to give notice to the respondent that this matter would be insisted upon as an independent ground of damages, or that it would be relied on in aggravation to enhance the damages for the assaults particularly articled in the libel. The answer is drawn to meet the allegations in the libel, and consequently neither of these matters are put in issue. If the amendment is allowed, the master must have liberty to amend his an-

swer, and time must be given to produce evidence on the new issues presented by the pleadings. This will necessarily lead to delay, and involve an increase of expense, and as the necessity of an amendment to reach the whole justice of the case, if any such necessity exists, of which I am not convinced, was occasioned by the fault of the libellant himself, in my judgment the amendment ought not to be allowed.

The master in his answer justifies the act as a necessary and proper act of discipline, and alleges "that at the time, the said libellant was not obedient to the respondent's commands, but assumed and took upon himself to do and act as he saw fit, in subversion of the necessary discipline and subordination of the crew of said ship, and in a manner to destroy the objects of the voyage and produce mutiny;" and he then proceeds to state that he gently laid him down on the deck and detained him there a short time, and on his promise to conduct better he was allowed to get up; but notwithstanding his promise he still manifested insubordination and insolence to the respondent, upon which he told him that he would seize him up in the rigging, and that "thereupon Pettingill threatened and dared him to do so, alleging if he did, that he the said Pettingill would make this respondent sweat for so doing;" and that afterwards, on mature consideration the following day he did cause him to be seized up for a short time and in a manner not to produce pain or injury, and that the chastisement was mild, necessary, and proper. Evidence has been offered by the master, in his defense, tending to prove that Pettingill was careless and negligent in the performance of his duty. I have no doubt that evidence of general and habitual negligence and carelessness in the discharge of duty, may be admitted in justification of punishment, when in a proper case it is administered to correct such habits of sloth and negligence, and may go in mitigation of damages when it does not amount to a full justification. The right of the master to correct a seaman by some kind of punishment, for habitual and systematic sloth and negligence, seems to result from his peculiar relation to the crew and the nature of the authority with which the law has intrusted him. He is invested with a sort of domestic authority, but it is of a peculiar character and of limited extent. It has an analogy to that of a parent over his children, or a master over his apprentice or pupil, but the analogy does not hold throughout. He has not the authority of a custos morum to correct his crew for general immorality of conduct. His power is limited to the correction of such delinquencies as are connected with the due performance of their special duties on board the vessel. But when the law imposes on the master the responsibility for the government of the vessel and the discipline of the crew, it clothes him with an authority commensurate with his duties and re-

sponsibilities. The safety of the ship, the comfort and health of the crew, and the success of the voyage depend on the prompt and punctual performance by each man of his appropriate duties, and it is a part of the master's duty to see that these duties are performed in a proper manner and with reasonable diligence. It would seem, then, that habitual sloth and negligence or wanton carelessness, if persevered in after proper admonition, may be corrected by suitable punishment.

When a seaman brings a suit for damages against the master for illegal and unjustifiable punishment, he puts in issue his general conduct and character during the voyage, or rather enables the master to put it in issue. But when the master means to rely on such matter in justification, or in mitigation of damages, he must set it out in his answer in a distinct allegation. The libellant has then notice of the defense and may be prepared to meet it. But if the answer contains no such defensive allegation, the libellant has no reason to suppose that his general conduct for the voyage is intended to be called in question. The evidence, therefore, to this point, in the actual state of the pleadings, is not properly admissible. But, if it were in the case, it is not of such a character, in my judgment, as ought to have a material influence on the decision. How, then, stands the case on the evidence that is properly applicable to the matters in issue between the parties? The cabin-boy lost a table cloth overboard. He being, from some cause, afraid to communicate the fact to the master, at his request the steward does it for him. Whereupon, without further apparent cause, the master commences a violent assault on the steward, knocks him down on the deck, shakes and jams him violently against the floor with his feet or knees, and seizes him with such force as to tear out a considerable quantity of his hair. The only offense that Pettingill had committed was his reply, when the master told him that he would flog him, that he would then seek redress from the laws of his country. But this threat as the master calls it, was not uttered, according to his answer, until after the assault on the deck; and it is represented in the answer as encouraging a mutinous spirit in the crew and as a justification of the punishment the next day. The next morning, without any further cause than that of avowing his intention to seek redress when he returned, and, as the master in his answer says, for an example, he caused him to be seized up by both hands, with his arms extended, as the master facetiously remarked, like a spread eagle, and kept him suspended in that ignominious posture before the crew for from half an hour to an hour, not, it is true, in a manner to cause great bodily pain, but exposing him to derision and ridicule, and accompanying the whole with a copious effusion of taunting and opprobrious language.

I can find in the evidence no cause for this punishment except the state of irritation into which the master was thrown by the loss of the table cloth; and the punishment was inflicted not on the boy who lost it, but on the steward who brought him the information. Pettingill might well say after this experience, the "bearer of ill tidings hath but a losing office," when he was obliged to expiate by a vicarious punishment in his own person, the offense which he only announced as a messenger. It is now, indeed, said, by the way of extenuation, that the steward was habitually remiss in his duty. But this, as has been before observed, was not relied upon in the answer and is not properly in issue, and, from the character of the evidence which is offered in support of it, seems brought in by an after-thought as a palliation of a gross outrage that is entirely without justification. On the whole evidence the punishment appears to me to have been a wanton abuse of power without any cause which could operate on the mind of a reasonable man, and I shall award damages to the amount of eighty dollars, with costs of suit.